**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**D/H OIL AND GAS COMPANY**

          **Plaintiff,**

                                        **CASE NO.  3:04-cv-448-RV/MD**

**vs.**

**COMMERCE AND INDUSTRY
INSURANCE COMPANY**

          **Defendant**.

_____/

<u>**ORDER**</u>

      Pending is the defendant's motion to dismiss or to transfer for improper venue. (Doc. 4).

      In this insurance dispute, the plaintiff D/H Oil and Gas Company brought a state court action seeking a declaration of its rights under an insurance contract issued by the defendant Commerce and Industry Insurance Company.  The defendant removed the case to federal court based on diversity jurisdiction under Title 28, United States Code, Section 1332.  Now, based on a Choice of Forum and Choice of Law provision in the insurance contract, the defendant moves to dismiss pursuant to Rule 12(b)(3), Federal Rules of Civil Procedure, or in the alternative, to transfer the case to a federal district court in the state of New York, pursuant to Title 28, United States Code, Section 1404(a).

I.      **FACTUAL SUMMARY**

The plaintiff D/H Oil and Gas Company ("D/H") is a Florida corporation which owns and operates a retail gas station located in at or near DeFuniak Springs, Florida. The gas station has an underground petroleum storage tank.   Defendant Commerce and Industry Insurance Company ("Commerce") is headquartered out of New York and provides insurance coverage for underground petroleum storage tanks.   Although Commerce is a New York corporation, it transacts insurance in Florida as a licensed property and casualty general insurance company.

When D/H's site in Defuniak Springs ("the site") commenced operations in 1996, D/H procured insurance through Florida Petroleum Liability Insurance Program Administrators, Inc., which is an agent of Commerce, but which does business solely in Florida.    As a result, Commerce issued a Storage Tank Third Party Liability, Corrective Action and Cleanup insurance policy to D/H.   The policy was delivered to D/H in DeFuniak Springs, Florida.   Through its agents in Florida, Commerce issued and delivered an annual renewal of the policy to D/H for several years.   Accordingly, there are two policies at issue in this case.   Policy One has effective dates of February 19, 2002, to February 19, 2003, and Policy Two has effective dates of February 19, 2003, to February 19, 2004.

In 1996, as part of construction of the D/H's gas station, Enterprise Brass Works, Inc., installed new spill containment vessels at the site.   These vessels are secondary containment devices designed to collect any leakage from product fill ports. However, during an inspection of the site on March 26, 2002, a representative of the Florida Department of Environmental Protection ("FDEP") observed that the spill containment vessels were defective and were required to be replaced.   By letter dated May 8, 2002,  the Department of Health, acting as an agent for FDEP, directed D/H to replace the vessels on its site.   Thereafter, D/H hired Sells Pump Service, Inc. to remove and replace the vessels.   D/H contends that Sells Pump Service, Inc. did not

observe any petroleum staining of the soils or petroleum odor during the replacement work.

Notwithstanding, the Department of Health, via a letter dated August 21, 2002, required D/H to screen the soils beneath the spill containment vessels to determine whether analytical sampling of the soils would be necessary.  In response, D/H retained Enviro-Pro-Tech, Inc. to perform the required soil screening.  On November 25 and November 26, 2003, Enviro-Pro-Tech, Inc., performed an organic vapor screening which indicated the existence of petroleum vapors in some samples.   On December 11, 2002,  laboratory results of these samples indicated that there had been a release of petroleum into the soils at the site.  As a result, the next day, Enviro-Pro-Tech reported the discharge of petroleum to FDEP, as required by law.  Shortly thereafter, FDEP issued an order asserting a claim for corrective action and requiring D/H to assess and remediate the petroleum release on the site.  After performing a Site Assessment, D/H determined that the petroleum release resulted in substantial contamination to the groundwater beneath the site consisting of a drinking water aquifer.  FDEP then required D/H to submit a remediation plan and to clean up the contamination in accordance with Chapter 62-770 of the Florida Statutes.

On February 20, 2003, D/H submitted the FDEP Claim to Commerce.  Ten months later, on December 8, 2003, Commerce informed D/H by letter that it was denying the claim, based on its assertion that the insurance policy expressly precluded coverage for any claim arising from pollution conditions existing prior to the inception of the policy and not disclosed in the application for the policy if the insured knew or could have reasonably expected that such pollution conditions could give rise to corrective action or cleanup.  According to Commerce, D/H failed to reveal pertinent information in its November 2002 renewal application, including the FDEP's March 2002 notification of defective spill containment vessels and its August 21, 2002, requirement for soil screening.  D/H argues that as of November 4, 2002, D/H was

advised that no petroleum soil staining or odors were observed beneath the defective spill containment vessels when they were replaced in May 2002, and confirmation of the petroleum release via laboratory analysis did not occur until December 11 and 12, 2002.

D/H filed a complaint in state court seeking a declaration of its rights under the two Commerce insurance policies, alleging that Commerce should provide coverage for the FDEP clam and also provide indemnification and a defense for D/H.  Plaintiff also seeks a declaration of its rights under Section 627.426(2) of the Florida Statues, which precludes an insurer from denying coverage unless the denial occurs within a specific time frame.[1]   Finally, the plaintiff seeks damages for breach of contract relating to Commerce's failure to provide coverage under both insurance policies.

Commerce removed the action to federal court based on diversity jurisdiction. Commerce now moves to dismiss D/H's action or, alternatively, to transfer the action to a federal district court in the state of New York, based on a choice-of-forum and choice-of-law clause contained in the insurance policies issued to D/H.

The forum selection clause in both of the policies at issue states:

> IX.    CHOICE OF LAW AND FORUM
> In the event that the Insured and the Company dispute the meaning, interpretation or operation of any term, condition, definition or provision of the Policy resulting in litigation, arbitration or other form of dispute resolution, the Insured and the Company agree that the law of the State of New York shall apply and that all litigation, arbitration or

---

[1] Florida Statute, Section 627.426(2) states:
>    A liability insurer shall not be permitted to deny coverage based on a particular coverage defense unless:
>    (a)  Within 30 days after the liability insurer knew or should have known of the coverage defense, written notice of reservation of rights to assert a coverage defense is given to the named insured by registered or certified mail sent to the last known addresss of the insured or by hand deliver; . . . "  Fla. Stat. §627.428(2)(a).

other form of dispute resolution shall take place in the State of New York.

## II.   DISCUSSION

### A.   Standard of Review

As an initial matter, the defendant has moved for transfer of venue, pursuant to Title 28, United States Code, Section 1404(a), or in the alternative dismissal pursuant to Rule 12(b)(3), Federal Rules of Civil Procedure.  Both motions are based on the forum selection clause in the insurance contract.  However, where a forum selection clause designates a domestic forum, the appropriate procedure for seeking enforcement of the clause is a motion to transfer venue pursuant to Section1404(a). The Supreme Court of the United States has explained that consideration of whether to enforce a forum selection clause in a diversity case is governed by federal law, under 28 U.S.C. §1404(a). Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 28-29, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988); See also P & S Bus. Machines, Inc. v. Canon USA, Inc., 331 F.3d 804, 807 (11th Cir. 2003).

The courts which have used Rule 12(b)(3) to dismiss a case in order to enforce a forum selection clause have generally done so where the contractual choice of forum is a foreign venue and, therefore, a transfer pursuant to Section 1404(a) is unavailable. See e.g., Lipcon v. Underwriters at Lloyd's, 148 F.3d 1285, 1290 (11th Cir. 1998); Webster v. Royal Caribbean Cruises, Ltd., 124 F. Supp.2d 1317, 1320 (S.D. Fla. 2000) (applying Rule 12(b)(3) where the forum selection clause selected another country as the proper forum for disputes); See also Digital Envoy, Inc. v. Google, Inc., 319 F. Supp. 2d 1377, 1379 (N.D. Ga. 2004)(noting that courts in the Eleventh Circuit have generally assumed that Rule 12(b)(3) only applies where transfer is impossible because the forum selection clause requires litigation in a foreign country); XR Co. v. Block & Balestri, P.C., 44 F. Supp. 2d 1296 (S.D. Fla. 1999)(addressing forum selection clause under Section 1404 and not Rule 12(b)(3)). Thus, whether the

forum selection clause in D/H's insurance contract mandates that this case be tried in a New York forum should be analyzed under the legal framework set forth in Title 28, United States Code, Section 1404(a).  The motion to dismiss must be denied.

 B. <u>Motion to Transfer</u>

 Title 28, United States Code, Section 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any district or division where it might have been brought."   Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an "individualized, case-by-case consideration of convenience and fairness." <u>Stewart Org., Inc. v. Ricoh Corp.</u>, <u>supra</u>, 487 U.S. at 29, 108 S. Ct. at 2244.  However, the Supreme Court of the United States explained that a valid forum selection clause is "a significant factor that figures centrally in the district court's calculus." <u>Id.</u>; <u>See also</u>, <u>P & S Business Machines, Inc. v. Canon USA, Inc.</u>, <u>supra</u>, 331 F.3d at 807.  Other case-specific issues to be addressed include the convenience of [the selected] forum given the parties' expressed preference for that venue, and the fairness of transfer in light of the forum-selection clause and the parties' relative bargaining power.  <u>Id.</u> at 30, 108 S. Ct. at 2244.  Furthermore, a district court should consider the "convenience of the witnesses and those public-interest factors of systemic integrity and fairness that, in addition to private concerns, come under the heading of 'the interest of justice.'" <u>Id.</u>

 Nevertheless, while a district court must consider case-specific factors indicating whether the "interest of justice" would be served by transfer to an alternative forum, the Eleventh Circuit also directs that when a motion under section 1404(a) seeks to enforce a valid forum selection clause, the opponent bears a heavy burden.  <u>In re Ricoh Corp.</u>, 870 F.2d 570, 573 (11th Cir. 1989).  In fact, a forum selection clause is given controlling weight in all but the most exceptional circumstances. <u>Stewart</u>, <u>supra</u>, 487 U.S. at 33, 108 S. Ct. at 2246 (Kennedy, J.,

concurring); In re Ricoh Corp., supra, 870 F.2d at 574.  Based on this guidance, this court must use case-specific factors to determine whether the transfer of this case to New York would serve the "interest of justice" in light of the contractual forum selection clause, as well as other 1404(a) considerations.

     C.    <u>Private Interest Factors</u>

While the existence of a valid forum selection clause is "a significant factor that figures centrally in the district court's calculus,"  the Supreme Court of the United States rejected the notion that it is a dispositive factor. Stewart, supra, 487 U.S. 22, 108 S. Ct. 2230.  Instead, other factors must also be weighed in the balance, such as the convenience of the parties and witnesses.  Id.  Such other private interest factors may also include the relative ease of access to sources of proof and the availability of process to compel the presence of unwilling witnesses. See e.g.,  A.J. Taft Coal Co., Inc. v. Barnhart, 291 F. Supp. 2d 1290, 1311 (N.D. Ala. 2003); McNair v. Monsanto Co., 279 F. Supp. 2d 1290 (M.D. Ga. 2003);  Jewelmasters, Inc. v. May Dept. Stores Co., 840 F. Supp. 893, 895 (S.D. Fla. 1993); Miot v. Kechijian, 830 F. Supp. 1460 (S.D. Fla. 1993).

However, in considering the convenience of the transferee forum in a Section 1404(a) analysis, when a forum selection clause exists, the party opposing the transfer carries the burden of persuading the court that the contractually chosen forum is a sufficiently inconvenient forum to justify retention of the dispute.  In re Ricoh Corp., supra, 870 F.2d at 573.   In this case, the incident that gave rise to D/H's claim for coverage was a discharge of petroleum that contaminated soil and groundwater in Florida.  In considering the convenience of the witnesses,  the great majority of witnesses will be located in Florida, including the petroleum discharge cleanup contractor, the FDEP inspector that inspected the site, the FDEP itself that will oversee and regulate the cleanup, and the defendant's agents that issued the policy in Florida, as well as the plaintiff's employees that submitted the insurance application and have

knowledge of the circumstances of the discharge.  In turn, the only witnesses located in New York are the defendant's claims handling personnel who denied the claim. While this factor is relevant, especially in light of the contractual forum selection clause, New York would be an inconvenient forum to the majority of witnesses in this case, including Florida state agencies such as the FDEP and the Department of Health.

Moreover, most of the pertinent documents and evidence in this case will be located in Florida, as well.  Even the bulk of the documents and witnesses necessary to *defend* the case will be located in Florida.  For instance, the dispute over whether Commerce should cover the cost of the clean-up at the site centers around Commerce's contention that D/H knew or could have reasonably expected that pollution conditions existed on the site which could give rise to corrective action, yet according to Commerce, D/H failed to disclose that information on its renewal application for insurance coverage submitted on November 4, 2002.   D/H contends that it did not know of actual contamination of the property until after the renewal application was submitted.   Thus, the FDEP's inspection of the property on March 26, 2002, as well as memoranda sent to D/H by the FEDP concerning potential spills on the property will most likely be the focal point of this litigation pertaining to D/H's knowledge of any potential pollution conditions before it renewed its insurance application in November.  All of the FDEP documents and personnel related to this case are located in Florida.   Therefore, it's apparent to me that the presence of documents and ease of access to sources of evidence, as well as the convenience of the witnesses, weighs heavily in favor of retaining this dispute in a Florida forum.

      D.   Public Interest Factors

In applying a Section 1404(a) analysis to determine whether to enforce a contractual forum selection clause, the Supreme Court of the United States stated that a district court should "take account of factors other than those that bear solely on the parties' private ordering of their affairs."  Stewart, supra, 487 U.S. at 31, 108 S.

Ct. at 2245. The district court must also consider "those public-interest factors of systemic integrity and fairness that, in addition to private concerns, come under the heading of 'the interest of justice.'" Id.

Florida's public interest in this insurance dispute is substantial and unique to the facts of this environmental contamination case.  Florida's statutory law is replete with provisions designed to protect the state's  natural resources, including its groundwater and  surface  waters.    For instance,  the  Florida  legislature  has  declared  that "preservation of surface and ground waters is a matter of the highest urgency and priority." §376.30(1)(b), Fla. Stat. (2004).  Section 376.30(2)(b) further states that "(s)pills, discharges and escapes of pollutants … pose threats of great danger and damage to the environment of the state, to citizens of the state, and to other interests deriving livelihood from the state."   In order to achieve the important public interest of  protecting  its  natural  resources  from  contaminants,  Florida  has  set  forth  a framework  for  preventing,  as  well  as  cleaning  up,  pollution,  which  requires  the "prompt containment and removal" of contaminants. §376.30(3)(b), Fla. Stat. (2004). See also, §376.305(1), Fla. Stat. ("Any person discharging a pollutant as prohibited by ss. 376.30 - 376.319 shall immediately undertake to contain, remove, and abate the  discharge  to  the  satisfaction  of  the  department."); §376.031(16), Fla. Stat. ("Pollutants," for such purposes are defined to include oil of any kind and in any form, gasoline, . . . ).

Further,  the  public  policy  of  the  state  in  protecting  its  citizens  from environmental  contamination,  and  specifically  petroleum  spills  from  underground storage tanks, is to strictly enforce minimum levels of insurance to protect the public. Notably, in reference to the accidental spill of petroleum pollutants, as in this case, Florida has created the Florida Petroleum Liability and Restoration Insurance Program ("FPLRIP")  which  provides  for  the  restoration  and  clean  up  of  certain  contaminated sites to be paid from the Inland Protection Trust Fund. §376.3072 Fla. Stat. (2004);

See also, §376.3071, Fla. Stat. (2004).  The Florida legislature created the Inland Protection Trust Fund ("IPTF") to help enable the FDEP to "respond without delay to incidents of inland contamination related to the storage of petroleum and petroleum products in order to protect the public health, safety, and welfare and to minimize environmental damage."[2] §376.3071(2), Fla. Stat. (2004).

In order to participate in this program and be reimbursed for clean up of contaminated sites, an underground petroleum storage tank owner must demonstrate financial responsibility for "third-party damages", i.e., personal injury and property damage in the event of an accidental discharge of petroleum. §376.3072(2)(a)(1), Fla. Stat. (2004).  In this respect, the owner or operator may demonstrate financial responsibility by obtaining insurance coverage through premium based insurance policies.  §376.3072, Fla. Stat. (2004).  Further, in conjunction with federal law, Florida requires the owner or operator of an underground storage tank to procure specified amounts of insurance coverage based on the volume of petroleum stored or maintained at the facility. Id.; 40 C.F.R. §280.90-280.115.  These financial responsibility laws are designed to protect the public from losses resulting from the accidental discharge of petroleum contaminants.  Thus, it is clear that the Florida legislature views the availability of insurance proceeds as an integral part of its statutory scheme to protect its citizens, and not just the insured, from environmental contamination.  Florida has a substantial public interest in regulating the procurement

---

[2]  In enacting the ITPF, the Florida legislature declared that spills and leaks from underground petroleum storage tanks "pose a significant threat to the quality of the groundwaters and inland surface waters of this state . . . (and) where contamination of ground or surface water has occurred, remedial measures have often been delayed for long periods while determinations as to liability and the extent of liability are made and that such delays result in the contamination and intensification of the threat to the public health, safety, and welfare; in greater damage to the environment; and in significantly higher costs to contain and remove the contamination." §376.3071, Fla. Stat. (2004).

of insurance and the containment of petroleum spills.

Further, the risk of the policy is wholly centered in Florida, and involves real property located in Florida.  The Eleventh Circuit has, in a different context, recognized Florida's strong public interest in adjudicating insurance disputes where the insurance purportedly covers real property located in Florida.  Lafarge Corp. v. Traveler's Indemnity Co., 118 F.3d 1511 (11th Cir. 1997); Shapiro v. Associated Int'l Ins. Co., 899 F.2d 1116 (11th Cir. 1990).  In resolving a choice-of-law issue in an insurance dispute, in Shapiro v. Associated Int'l Ins. Co., the Eleventh Circuit recognized that in a case involving an insurance contract on real property, Florida has a strong public interest.  Specifically, the court rejected the application of another state's law to the insurance contract "because of the strong interest Florida displays in regulating insurance when the insured risk is located within the state." Id. at 1121.

In arriving at this conclusion, the Shapiro Court cited Florida's Insurance Code which provides in relevant part, "No person shall transact insurance in this state, or relative to a subject insurance resident, located, or to be performed in this state, without complying with the applicable provisions of this code."  Id. (citing §624.11, Fla. Stat.)).  The Code further provides,

> No person shall act as an insurer, and no insurer or its agents, attorneys, subscribers, or representatives shall directly or indirectly transact insurance, in this state except as authorized by a subsisting certificate of authority issued to the insurer by the department, except as to such transactions as are expressly otherwise provided for in this code."
> §624.11(1), Fla. Stat. (1984).

Citing this provision, the Eleventh Circuit noted, "(s)uch regulation of the insurance industry indicates that Florida has a significant interest in litigation involving insurance of risks permanently located in Florida . . ."  Id. at 1121.[3]

_____

[3] The Shapiro Court also cited its own "traditional deference to local law in cases involving the adjudication of interests in real property" and Florida's application of the law of the situs in disputes centered on real property. Id. at 1121 (internal citations

While <u>Shapiro</u> did not involve the issue of a contractual forum selection clause, but rather common law choice-of-law issues, it is important to note that the Eleventh Circuit distinguished the usual insurance contract, in which the common law rule of *lex loci contractus* applied, from an insurance contract which insured real property located permanently in the state of Florida.    In the latter situation, the court recognized that Florida's public interest is particularly strong.  In this case, Florida's public interest in the dispute is even stronger.  For instance, groundwater which was contaminated as a result of the leak in D/H's underground storage tank is owned by the state of Florida itself, and not D/H.   See <u>Pepper's Steel & Alloys, Inc. v. Fidelity ad Guar. Co.</u>, 668 F. Supp. 1541 (S.D. Fla. 1987)(holding that groundwater underneath real property belongs to the State and its citizens and is not capable of being privately owned); <u>Village of Tequesta v. Jupiter Inlet Corp.</u>, 371 So. 2d 663, 667 (Fla. 1979). Further, in cases involving contamination and potential pollution, the insured risk implicates the public safety, health and welfare of Florida's citizens other than just the insured.

In <u>Carnival Cruise Lines, Inc. v. Shute</u>, the Supreme Court of the United States recognized that forum selection clauses have "the salutary effect of dispelling any confusion about where suits arising from the contract must be brought and defended, sparing litigants the time and expense of pretrial motions to determine the correct forum and conserving judicial resources that otherwise would be devoted to deciding such motions."  499 U.S. 585, 593-94, 111 S. Ct. 1522, 1527, 113 L. Ed. 2d 622 (1991).    However, the <u>Shute</u> Court also found it significant that in that case the dispute was not essentially a local one inherently more suited to resolution in one state.  <u>Id.</u> at 594, 111 S. Ct. at 1528.  Therefore, deciding *ex ante* the appropriate forum for resolution of potential disputes had a more salutary effect than, perhaps, in a case such as this where the dispute is inherently local.  For instance, in this case,

omitted).

Commerce is subject to Florida's insurance regulation, and in fact, must be certified to sell insurance in the state of Florida;  Commerce's agents are located within the state of Florida, the plaintiff procured the insurance through those local agents, and the property insured in located wholly within the state of Florida.  In such an inherently local dispute, the initial confusion surrounding the appropriate forum is not readily apparent.

Other federal courts have determined that the enforcement of a forum selection clause in an environmental insurance contract would be unjust.  For instance, in Seneca Insurance Company v. Henrietta Oil Company, 2003 WL 255317 (S.D.N.Y. 2003), the insured owned an underground petroleum storage tank located in Texas, but the insurance contract required the parties to litigate any disputes in New York. The district court concluded that the forum selection clause was "unjust" based on a variety of factors, including the convenience of the witnesses, its determination that the insured, a Texas company, could not have anticipated being haled into a New York Court, and finally on Texas' public interest in the litigation. Id. at *4.  With respect to the last factor, the district court noted "the [Texas Natural Resources Conservation Commission], a Texas regulatory body, has an interest in the case, as does the Texas Department of Insurance.  [The insurer] is a New York insurance company, but again it has been doing business in Texas for years and is subject to supervision in Texas." Id.  Significantly, the district court also reasoned,

> "Indeed, the claim arose in Texas –the alleged pollution occurred in an underground tank in [a Texas city], the fumes were detected in the [city's] sewer system; and the cleanup was performed in Texas by Texas personnel.  The Texas witnesses could not be subpoenaed to testify in this Court. The documents relating to the incident, damage, and cleanup were generated and are located primarily in Texas." Id. at *3.

Similarly, in Keweenaw Konvenience, Inc. v. Commerce and Industry Insurance Company, 2001 WL 34070116 (W.D. Mich. 2001), the district court refused to enforce a forum selection clause identical to the clause at issue in this case.  In

analyzing those factors which fall under the "interest of justice", the court emphasized, that unlike the circumstances in <u>Carnival Cruise Lines, Inc. v. Shute</u>, <u>supra</u>, 499 U.S. 585, 111 S. Ct. 1522, and other forum selection clause cases, a dispute involving environmental contamination insurance is inherently a local one.  <u>Id.</u> at *5.  The district court acknowledged that the plaintiff carried a heavy burden in overcoming the "significant and central place" afforded forum selection clauses, but held that the plaintiff had met that burden, explaining "(t)his is a case brought by a Michigan insured concerning the contamination of Michigan property.  The property is subject to the jurisdiction of the Michigan Department of Environmental Quality." <u>Id</u>  Further, the court stated, "On the balance, the interests of justice favor the trial of this case in Michigan where the insured property and most of the witnesses are located, particularly in light of Michigan's interest in the cleanup of environmentally contaminated property . . ." <u>Id.</u>

I agree with the reasoning of these courts, and I find that transferring this case to a federal court in New York, which has very little (or no) connection to this dispute, would not be in the interest of justice.  While valid forum selection clauses are to be enforced in most circumstances, this case plainly presents an exception to the general rule.  After carefully considering all of the factors relevant to a Section 1404(a) analysis, the other public and private interest factors in favor of retaining this dispute in Florida far outweigh the interest in enforcing the forum selection clause.

**III.   CONCLUSION**

For the foregoing reasons, the defendant's motion to dismiss, or in the alternative to transfer, (Doc. 4) is DENIED.

DONE and ORDERED this 9th day of May, 2005.

*/s/ Roger Vinson*
**ROGER VINSON**
**Senior United States District Judge**

Case No.:3:04cv448/RV/MD